IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RUSSELL D. HENION, | ) | CIVIL NO. 06-00298 LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES POSTAL SERVICE | ) | |
| and JOHN E. POTTER, | ) | |
| POSTMASTER GENERAL, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER AFFIRMING MERIT SYSTEMS PROTECTION
BOARD'S DECISION AND GRANTING DEFENDANTS'
MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

On November 10, 2008, this Court held a hearing on

Plaintiff Russell D. Henion's ("Plaintiff") Appeal from Merit

Systems Protection Board ("MSPB") Ruling, and Defendants United

States Postal Service ("the Agency") and Postmaster General

John E. Potter's (collectively "Defendants") Motion to Dismiss,

and/or for Summary Judgment, filed September 8, 2008 ("Motion").

Appearing on behalf of Plaintiff was Elbridge Smith, Esq., and

appearing on behalf of Defendants was Assistant United States

Attorney Edric Ching.  After careful consideration of Plaintiff's

appeal, Defendant's Motion, supporting and opposing documents,

and the arguments of counsel, the MSPB's decision is HEREBY

AFFIRMED, and Defendants' Motion is HEREBY GRANTED for the

reasons set forth below.

**BACKGROUND**

I.   **Factual Background**

Plaintiff was previously employed by the Agency as a Custodial Group Leader at the Processing and Distribution Center of the Honolulu Airport.  On October 11 and 12, 2002, Plaintiff worked his usual 10:30 p.m. to 6:30 a.m. shift.  [Defendants' Supplemental Excerpts of Record ("SER") at 2 (Administrative Judge's Initial Decision, dated 5/14/04 ("Initial Decision") at 2).]

The Processing and Distribution Center has twenty-nine fixed video cameras that monitor specific areas within and on the perimeter of the facility.  The camera feeds are recorded, but they are not continuously monitored.  On October 11, 2002, cameras 3 and 14 were moved so that they pointed toward the ceiling instead of at their designated areas.  Camera 3 covers an area used by a vendor, the post office boxes, and the main office window.  Camera 14 covers a portion of the accountable mail area, *i.e.* the registry.  Bryant Petty, the Building Equipment Mechanic whose duties included maintenance of the security cameras, returned camera 3 to its original position by adjusting the bolt and nut securing it.  He also repositioned camera 14.  According to Mr. Petty, camera 14 cannot be repositioned simply by pushing on it.  In order to point camera 14 to the ceiling, a person would have to pull on the cord and conduit at the rear of the

camera.  Other than changing it to cover a new area, Mr. Petty never had to reposition camera 14 before October 11, 2002.  [Id. at 2-3.]

On October 12, 2002, cameras 1, 2, 3, and 14 were moved.  The video tapes from the cameras show that Plaintiff was in each of those areas when the camera was moved.  Several days later, Plaintiff's supervisor referred to Plaintiff having damaged government property and alluded to the possibility of disciplinary action.  On October 23, 2002, Plaintiff went to the Postal Inspection Service to volunteer a statement about the cameras.  Plaintiff spoke to Postal Inspector Richard Hall, who stated that he was not handling the camera investigation, but that the wanted to talk to Plaintiff about another matter.  Plaintiff told Inspector Hall that he would write out a statement about the other incident and return with it.  According to Plaintiff, as he was leaving, Inspector Hall said to a woman in the office, "He has to go now.  I asked him to bring a statement back tomorrow."  Although Plaintiff did not know her identity at the time, Plaintiff later learned that the woman was Postal Inspector Kathryn Derwey, who was handling the camera investigation.  Plaintiff never returned to provide a statement about either matter.  [Id. at 3-4.]

Inspector Derwey completed an "Investigative Memorandum" dated January 6, 2003.  [Exh. E to Defs.' Concise

Stat. of Material Facts in Supp. of Defendants' Motion ("Defs.' CSOF").]  On February 21, 2003, Plaintiff was placed on "emergency" suspension.[1]  Plaintiff was returned to duty for his March 31, 2003 "day in court" meeting with Eugene Sano, the Manager of Maintenance Operations.  Plaintiff was subsequently returned to regular duty.  After his return to duty, Plaintiff was assigned the additional daily task of patrolling the fence on the perimeter of the facility.  [Initial Decision at 5.]

During the day in court meeting, Mr. Sano questioned Plaintiff based upon the format of the Investigative Memorandum. Mr. Sano proposed Plaintiff's removal, and Herbert Yokoyama, Manager of Maintenance,[2] concurred.  The proposed removal was based upon one charge of "unacceptable conduct", supported by two specifications: the unauthorized repositioning of four security cameras on October 12, 2008; and the failure to cooperate with the security camera investigation.  Plaintiff received notice of the proposed removal approximately two weeks after the day in court meeting.  [Id. at 6.]

On April 28, 2003, a union steward presented

_____

[1] The duration of Plaintiff's suspension is uncertain. Plaintiff testified that he filed a grievance regarding the suspension, but he did not appeal the ruling regarding the suspension.  [Initial Decision at 5 & nn.6 & 7.]

[2] Although they have similar titles, Mr. Yokoyama is Mr. Sano's supervisor.  [Defs.' CSOF, Decl. of Herbert Yokoyama at ¶¶ 1, 4.]

Plaintiff's response to the charges.  Plaintiff did not attend
the meeting.  He testified that he did not attend because, when
he received the notice of the proposed removal, Mr. Sano told him
that Glen Sakagawa, the Senior Manager, did not want to see him.
The Agency issued its decision on May 9, 2003.  Mr. Sakagawa
sustained both charges and ordered Plaintiff's removal as of
May 30, 2003.  [Id. at 7; Exh. A to Defs.' CSOF (Letter of
Decision - Removal).[3]]  The union president sought to have a last
chance agreement substituted for the removal, but Mr. Sakagawa
determined that the infraction was too severe.  [Initial Decision
at 7; Record on Appeal, filed 2/15/08 (dkt. no. 39-4), Initial
Appeal File - Volume I, part 1, at 54 (Letter dated 6/20/03).[4]]

## II.  **Administrative Proceedings**

On June 17, 2003, Plaintiff filed an appeal to the
MSPB.  A hearing was held on October 20, 2003, with closing
arguments conducted by telephone on November 25, 2003.
Administrative Judge Sidney Farcy ("the AJ") issued the Initial
Decision on May 14, 2004.  The AJ found that the Agency proved
the charge of unacceptable conduct with regard to the
repositioning of the security cameras, but had not proven the
charge with regard to the failure to cooperate with the

---

[3] The Letter of Decision can also be found at SER 86-89.

[4] The page numbers refer to the pages as numbered in the
district court's Electronic Document Filing System.

investigation.  The AJ, however, affirmed Plaintiff's removal, finding that it was within the bounds of reason based on Plaintiff's misconduct.  [Initial Decision at 1-2.]

The AJ found that Plaintiff "deliberately moved the security cameras without authority to do so."  [Id. at 8.]  The AJ noted that, shortly after the security cameras were installed, Plaintiff attended an employee training session during which employees were told about the cameras.  Plaintiff admitted that he is the person seen in the video tapes before the cameras are moved.  He also admitted that he moved the cameras, but he claimed that he inadvertently moved the cameras while attempting to clean them.  The AJ, however, found that Plaintiff's explanation was not credible.  [Id.]

Plaintiff testified that, on October 11, 2002, he attempted to clean camera 3 because he saw black dust on it.  He stated that he must have hit the back of the camera and moved it while trying to dust it.  Plaintiff stopped trying to clean camera 3 because his efforts were unsuccessful.  He tried to clean camera 14, in the registry area, because he thought the cameras in that area would be even more dirty than those in the Post Office Box area, where camera 3 is.  In addition, Plaintiff testified that someone asked him to clean the spider webs on the back of camera 14.  Plaintiff stated that he accidentally moved camera 14 while trying to clean the spider webs.  He looked for a

ladder so that he could reposition the camera, but the only one
he found was too heavy for him to lift.  Plaintiff told someone
in the maintenance room that he needed a ladder because something
was out of position.  [Id. at 8-9.]

On October 12, 2002, Plaintiff returned to try to
finish cleaning cameras 3 and 14.  He noted that the cameras had
been returned to their original positions.  When he tried to
clean them, they moved again, and he could not find a ladder to
reposition them.  Plaintiff testified that he tried to reposition
camera 3 with a broom.  He also testified that, after he
accidentally hit camera 14, it swung so erratically that he
thought it would fall.  Plaintiff tried to clean camera 2 because
there were bird droppings on it.  [Id. at 9.]  The AJ
acknowledged that "it is more likely than not that those cameras
were exposed to birds."  [Id. at 9 n.17.]  Plaintiff testified
that he may have told a Mr. Sugihara, the supervisor of
maintenance operations, about the cameras.  [Id. at 9 & n.18.]

The AJ found that Plaintiff's testimony about the
cameras' movement was not credible.  In so finding, the AJ noted
that, during the day in court meeting, Plaintiff: 1) denied that
he was the person seen on the video tapes;[5] 2) denied knowing

---

[5] The AJ however gave little weight to the denial because
Plaintiff did not have access to the video tape during the day in
court meeting.  Plaintiff merely responded to a description of
the tape.  [Initial Decision at 10 n.19.]

that he moved the cameras while cleaning them; 3) did not mention looking for a ladder to reposition the cameras; and 4) claimed that he observed cobwebs on the cameras, but did not mention any complaints about them.  The AJ stated that it was unlikely that Plaintiff's memory about the incident improved since the day in court meeting.  Further, the AJ found it "beyond belief" that an employee who moved two cameras one day would repeat his actions several times the next day, particularly where one of the cameras swung so violently that Plaintiff thought it would fall.  [Id. at 10.]  The AJ noted that Plaintiff argued that the summary of the day in court meeting was inaccurate and that he never denied moving the cameras.  The AJ found that Mr. Sano's contemporaneous typewritten notes of the day in court meeting were more credible than Plaintiff's testimony.  [Id. at 10 n.20; Record on Appeal, filed 2/15/08 (dkt. no. 39-5), Initial Appeal File, Volume I, part 2, at 2-3 (typewritten notes of Day in Court (Russell D. Henion)).]  The AJ noted that the only clear view of Plaintiff moving the cameras came from camera 14.  The tape shows that Plaintiff used "considerable force and appear[ed] to be striking at the camera, rather than merely dusting cobwebs."[6]  [Initial Decision at 11.]  Further, Plaintiff claimed that the camera moved violently when he tried to reposition it with the

---

[6] Based on his review of the tape, however, the AJ disagreed with Mr. Sakagawa that Plaintiff used the handle of broom, rather than the bristles, on the camera.  [Initial Decision at 11.]

8

broomstick, but all four video tapes show virtually no movement after the camera is moved out of position.  The AJ also noted that other cameras filming the vicinity of the moved cameras showed that Plaintiff was only in each area for a brief time. The AJ found that this was inconsistent with Plaintiff's claim that he tried to reposition the cameras after moving them.  The AJ expressed concern about Plaintiff's clear knowledge that he was being filmed when he moved the cameras.[7]  The AJ found that the evidence as a whole proved that Plaintiff intentionally moved the cameras.  [Id. at 11-12.]

     With regard to the failure to cooperate charge, the AJ found that Plaintiff never received proper notice that he was expected to cooperate with the camera investigation by giving a statement.  Inspector Derwey testified that she never attempted to contact Plaintiff and she never warned him that he could face disciplinary action if he did not submit to an interview.  [Id. at 14-15.]  The Investigative Memorandum states that Plaintiff agreed to return to discuss the camera matter the day after he spoke to Inspector Hall, and Inspector Derwey testified that she and Inspector Hall waited for Plaintiff at their office the next day.  Plaintiff, however, testified he told the postal inspectors that they should not count on him returning the next day because

---

     [7] Before he moved camera 14 on October 12, Plaintiff looked directly into the camera and smiled.  [Initial Decision at 12.]

he needed his sleep.  The AJ found Plaintiff's testimony on this issue to be more credible than Inspector Derwey's.  Further, the AJ found that, when Plaintiff told Inspector Hall that he would return with a written statement the next day, Inspector Derwey misinterpreted the statement to be a reference to the camera investigation.  The AJ noted that Inspector Derwey only came into the conversation between Plaintiff and Inspector Hall toward the end of the conversation.  In addition, Plaintiff consistently questioned why he was never asked to give a statement about the cameras.  The AJ found that it was reasonable for Plaintiff to believe that, after voluntarily raising the camera issue to the postal inspectors, he was free to abandon it.  [Id. at 16-17.]

The AJ noted that a postal inspector attempted to contact Plaintiff through his supervisor on January 2, 2003, but the supervisor said that Plaintiff's attendance had been irregular and that Plaintiff was not available.  Inspector Derwey testified that she believed they had been told Plaintiff was on workers' compensation leave prior to that time.  Inspectors were told in April that Plaintiff was available, but they did not interview him because the Investigative Memorandum had been completed.  [Id. at 15 & n.27.]  Inspector Derwey testified that there were attempts to contact Plaintiff at his home, but the people at that number were uncooperative.  Plaintiff testified that he had to move out of his mother's home because he struck

10

his sister during an altercation.  The AJ accepted this explanation and noted that his mother's house was not his usual place of abode during the time in question.  Further, it was not surprising that his mother and his sister were uncooperative in light of the circumstances that prompted Plaintiff to move out. [Id. at 14 & n.24.]

At the hearing before the AJ, Plaintiff raised the affirmative defenses of disability discrimination and harmful procedural error.[8]  Plaintiff alleged that, in finding that he failed to cooperate with the camera investigation, the deciding official improperly considered Plaintiff's work absences, which were allegedly due to a disability.  The deciding official stated that he believed Plaintiff's poor work attendance contributed to the investigation's delay.  The AJ found that Plaintiff failed to establish that he either was, or was considered to be, a disabled person.  [Id. at 17-18.]

Plaintiff testified that he has cardiovascular hypertension and a cyclothymic disorder and that he has Department of Veteran Affairs ("VA") service-connected disability ratings for these conditions.  He also underwent coronary artery

---

[8] Plaintiff also raised a due process argument with regard to the failure to cooperate incident.  The AJ did not consider this argument based upon the Agency's failure to prove that charge.  [Initial Decision at 20.]

bypass grafting.[9]  He cannot lift more than fifty pounds and, for

an unspecified period of time, he could not lift more than

twenty-five pounds.  Plaintiff takes medications for his

conditions, and his conditions affect his life-style.  He does

not "party" and walks for exercise.  He also testified that the

Agency's medical officer is aware of his conditions.  The AJ

found that Plaintiff was not disabled because he did not

establish that any of his major life activities are substantially

limited, nor did he identify any jobs that he cannot do because

of his restrictions.  Further, Plaintiff did not present any

evidence that the officials who proposed and decided his removal

were aware of his conditions.  For example, Mr. Sakagawa

testified that Plaintiff's work absences were only part of the

explanation for his failure to meet with the inspectors and were

not part of the reason for removing him.  The AJ therefore

concluded that Plaintiff did not establish his affirmative

defense of disability discriminated.  [Id. at 18-20.]

Plaintiff also raised the following incidents of

harmful procedural error: delay in disciplinary action; failure

to provide the video tape; failure to obtain proper review before

---

[9] Around 1998, Plaintiff suffered three heart attacks.
Plaintiff also states that he has been diagnosed with depression
and is taking Bupropion.  Plaintiff had chest pains, premature
ventricular contractions, and breathing episodes as often as once
every couple of days from 1999 to the beginning of 2001.  [Mem.
in Opp. at 2-3.]

initiating disciplinary proceedings; and Mr. Sakagawa held his failure to appear against him after Mr. Sano told Plaintiff that Mr. Sakagawa did not want to see him.  [Id. at 21-23.]

Plaintiff argued that the charges against him were untimely under the requirements of the collective bargaining agreement between the Agency and the American Postal Workers Union ("CBA").  The AJ, however, found that the CBA did not mention time limits on the imposition of discipline.  Further, Plaintiff did not prove that he was prejudiced by the delay, nor did he show that the outcome would have been different if the proceedings had been timely.  The AJ also noted that a delay in discipline can be excused if it is due to a delay in completing the investigation into the charges.  [Id. at 21.]

Plaintiff further argued that the Agency should have provided the video tape to either Plaintiff or the proposing official prior to the day in court meeting.  Plaintiff, however, never requested access to the video tape, and the proposing official relied upon the investigative report in framing the charges.  The investigative report included a detailed description of the alleged incident, and the AJ noted that it was unlikely that viewing the video tape before the day in court meeting would have improved Plaintiff's recollection of the events.  Even if the failure to provide the video tape was error, Plaintiff did not show how it affected the outcome, particularly

in light of the fact that Plaintiff admitted moving the cameras. [Id. at 21-22.]

Plaintiff also alleges that the disciplinary procedures were improperly initiated because article 16.8 of the CBA states: "In no case may a supervisor impose suspension or discharge upon an employee unless the proposed disciplinary action by the supervisor has first been reviewed and concurred in by the installation head or designee." [Id. at 22.] Plaintiff apparently argued either that: 1) Mr. Sano was not his supervisor and Mr. Sugihara was; or 2) the Agency did not establish that Mr. Yokoyama was the designee of the installation head. The AJ noted that article 16.8 only applies to the imposition of discipline, not the initiation of disciplinary proceedings. Further, Mr. Sakagawa, the installation head, clearly concurred in the disciplinary action because he was the deciding official. [Id.]

Finally, Plaintiff argued that he did not appear before Mr. Sakagawa to present his defense because he asked Mr. Sano if Mr. Sakagawa wanted to see him and Mr. Sano said "No, not really." Mr. Sakagawa testified that Plaintiff's failure to appear was one of the factors that he considered. He wanted to meet with Plaintiff and he testified that, if Plaintiff "had been told not to appear, he believed that factor could be prejudicial to his case." The AJ found that Plaintiff's testimony on this issue was credible. The AJ, however, found that Mr. Sano's

14

statement was "an off-hand comment and does not appear to vitiate
the proper notice given the appellant and does not violate any
regulation or procedure."  The AJ also noted that Plaintiff was a
former union steward and it was unlikely that he would he would
rely on such a casual comment without consulting his union
representative.  Further, Plaintiff did not show that the outcome
would have been different if he had appeared before Mr. Sakagawa,
particularly because the arguments that Plaintiff presented at
the hearing before the AJ were the same ones that the union
representative raised before Mr. Sakagawa on Plaintiff's behalf.
[Id. at 23.]  The AJ therefore concluded that Plaintiff failed to
establish his affirmative defense of harmful procedural error.
[Id. at 24.]

        The AJ, however, found that Mr. Sakagawa's penalty
determination did not warrant deference because Mr. Sakagawa did
not properly consider the relevant mitigating factors.  In
determining the appropriate penalty, Mr. Sakagawa only considered
the seriousness of the charge.  He considered Plaintiff's length
of service, but only to the extent that it affected Plaintiff's
conduct.  Based upon his own review, the AJ determined that
removal was an appropriate penalty.  The AJ noted the following
factors: the seriousness of the charge; custodians' virtually
unlimited access to the facility; and the expansion of
Plaintiff's duties to include patrolling the perimeter of the

15

facility.[10]   In addition, the AJ noted the following mitigating factors: Plaintiff had more than twenty years of service with the Agency; he had no prior disciplinary actions; and there was no evidence that any untoward events occurred because Plaintiff moved the cameras.[11]   [Id. at 24-25.]   The AJ ultimately found that removal was "within the tolerable bounds of reasonableness" because Plaintiff breached the significant trust that the Agency places in its custodians.   [Id. at 26.]

Plaintiff sought review before the full MSPB Board, which denied his petition for review on August 30, 2005, rendering the Initial Decision the MSPB's final decision in the matter.   [SER at 61 (MSPB Final Order dated 8/30/05 at 2).] Plaintiff sought review of the final order by the United States Equal Employment Opportunity Commission ("EEOC"), Office of Federal Operations.   On April 26, 2006, the EEOC issued its decision, concurring in the MSPB's final decision and finding no

---

[10] The AJ noted that this factor cut both ways because, while it demonstrated that the Agency trusted its custodians, it also showed that the Agency treated Plaintiff inconsistently. The Agency expanded his duties after placing him on emergency suspension because he was a security threat.   [Initial Decision at 25.]

[11] Although the four cameras could not record unusual events because they were out of position, there were more than twenty other security cameras and none of them recorded anything unusual during the time that the four cameras were out of position. [Initial Decision at 25.]

discrimination.[12]   [Record on Appeal, Part I, Tab 11.]

## III.  **The Instant Case**

On May 26, 2006, Plaintiff filed his Employment Discrimination Complaint and Civil Service Appeal ("Complaint") in the instant case.  The Complaint alleges the following claims: unlawful employment discrimination (hostile work environment), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII" and "Count One"); disparate treatment discrimination based on his actual and perceived disability and his opposition to prohibited personnel practices, and subjection to a hostile work environment, in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a ("Rehabilitation Act"), and related Executive Orders ("Count Two"); review of the MSPB's decision pursuant to 5 U.S.C. § 7703 ("Count Three").  Count Three alleges that: removal was too harsh a penalty in light of his years of service and his status as a disabled veteran; the AJ failed to properly consider all mitigating factors; the AJ made an unnecessary and prejudicial credibility determination because there was no question that Plaintiff was not authorized to move the cameras; and the AJ's adverse credibility finding was unsupported. Plaintiff seeks: declaratory relief; compensatory damages, back

---

[12] Although the EEOC's decision is dated April 26, 2006, it is stamped "RECEIVED" by the MSPB on May 26, 2006.

pay, the restoration of sick and annual leave; attorney's fees
and costs; and other appropriate relief.

### A.   **MSPB Appeal**

Plaintiff filed his Opening Brief on August 22, 2008.
Plaintiff notes that <u>Douglas v. Veterans Administration</u>, 5
M.S.P.R. 280, 306 (1981), sets forth a non-exhaustive list of
relevant factors to be considered in determining whether a
penalty is appropriate.  Not all factors are relevant in every
case.  Plaintiff argues that a proper analysis of the relevant
factors reveals that removal was too harsh a penalty.  Plaintiff
also notes that MSPB decisions favor progressive discipline and
that, under the CBA, discipline should be corrective rather than
punitive.  Plaintiff argues that his removal violates both
principles.

Plaintiff further argues that the AJ failed to consider
all of the applicable mitigating factors.  Plaintiff complains
that the AJ only considered four of the <u>Douglas</u> factors.  For
example, while Plaintiff concedes that the Agency probably never
had other cases involving the movement of the security cameras
prior to the incident, there must have been other charges of
unauthorized conduct which allegedly compromised security.  Thus,
the AJ did not consider whether Plaintiff's penalty was
consistent with the penalties in other similar cases.
Plaintiff's offense was not a notorious incident, and it did not

18

harm the Agency's reputation.  Further, Plaintiff expressed
profound remorse.  Plaintiff also stresses that the AJ apparently
did not consider whether there were other lesser, but still
effective, sanctions available.

Plaintiff notes that there were numerous instances
where the AJ found him to be credible.  The AJ, however, found
that Plaintiff's explanation that he accidentally moved the
cameras while trying to clean them was not credible.  The AJ's
credibility finding was not based on Plaintiff's demeanor during
the hearing.  Plaintiff therefore contends that the AJ's
credibility finding is not supported by the record and is not
entitled to deference.

In making his credibility finding, the AJ discussed the
day in court meeting and noted that Plaintiff initially denied
being the person in the video tape and denied knowing that he
moved the cameras.  Further, he did not mention receiving
complaints about cobwebs, looking for a ladder to reposition the
cameras, or telling a supervisor that he had moved the cameras.
Plaintiff emphasizes that he did not see the video tape during
the day in court meeting and the meeting consisted of having
Plaintiff respond to paragraphs in the investigative memorandum.
Thus, there was limited opportunity for Plaintiff to raise new
information.  Plaintiff also argues that the fact that the
cameras moved on October 11 when he tried to clean them does not

mean that he could not have tried to clean them again on October 12.  In between the two attempts, the cameras were repositioned and there were no complaints about their movement.

Plaintiff also argues that the AJ should not have relied on Mr. Sano's typewritten notes about the day in court meeting because they are double hearsay.  Plaintiff argues that the notes are inaccurate because he never denied having moved the cameras.  Plaintiff also argues that the AJ should not have considered the fact that the cameras did not show any movement while Plaintiff was allegedly trying to reposition them.  The cameras are stop-frame, intermittent recording cameras, not continuous recording cameras.  Further, the fact that they moved while he was trying to clean them does not necessarily mean that they would necessarily move while he tried to reposition them.  Plaintiff also notes that Mr. Sano's and Mr. Petty's testimony showed that the cameras were loose.  Finally, Plaintiff argues that there was no testimony to support the AJ's finding that Plaintiff intentionally moved the cameras.  Plaintiff therefore argues that the Court should reverse the MSPB's decision and impose a less severe penalty.

Defendants filed their Answering Brief on September 23, 2008.  Defendants argue that this Court should affirm the MSPB decision because removal is an appropriate remedy for the sustained charge.  Defendants argue that the AJ's determination

is supported by substantial evidence.  Although the AJ noted that
the deciding official failed to consider certain Douglas factors,
the AJ's own review of the Douglas factors yielded the same
result.  Defendants argue that the AJ's analysis of the Douglas
factors was proper.

Defendants further argue that the AJ's adverse
credibility determination was supported by substantial evidence.
Defendants note that courts give great deference to an
administrative law judge's credibility findings.  The AJ pointed
to specific evidence in the record which supported his finding
and he was in the best position to make such findings.
Defendants also argue that Plaintiff's arguments that his efforts
to reposition the cameras would not have moved them and that a
stop-frame recording camera would not have recorded his efforts
to reposition the cameras are pure conjecture.  Finally,
Defendants note that hearsay is admissible in MSPB proceedings
and may be considered sufficient evidence.  Defendants therefore
urge the Court to affirm the MSPB's finding that Plaintiff
committed misconduct and to find that the removal decision was
not arbitrary and capricious.

Plaintiff filed his Reply Brief on October 6, 2008.
Plaintiff argues that there is no support for the AJ's finding
that Plaintiff went through training and was informed that he was
not to clean the cameras.  There is no evidence in the record

21

that Plaintiff, or any other custodian, was instructed not to
clean the cameras.  The record only indicates that the training
occurred during a "Stand up" meeting.  [SER at 96 (4/15/03 Notice
of Proposed Removal at 2).]  It was therefore a brief meeting
where all employees were addressed as a group.  It was not an
extended training for custodians.

Plaintiff also argues that the AJ and Defendants
improperly characterize the day in court meeting as an agency
hearing.  It was merely pre-disciplinary questioning where
Mr. Sano questioned Plaintiff about the first twenty-three
paragraphs of the Investigative Report.  Plaintiff could not ask
questions, did not get to see the video tape, and not get an
advance copy of the Investigative Report.  Mr. Sano did not ask
any questions apart from the report.  Plaintiff did not have the
opportunity to mention things like complaints about the cobwebs
or birds, but the AJ held his failure to do so against him.

With regard to the typewritten notes that Mr. Sano made
about the day in court meeting, Plaintiff notes that Mr. Sano
prepared them at an unspecified time after the meeting.
Plaintiff concedes that hearsay is admissible, but he argues that
it should not be considered in a vacuum.  The AJ should have
explained why he found the notes to be credible.  Plaintiff
complains that the typewritten notes were not made under oath and
Defendants never produced Mr. Sano's handwritten notes taken

22

during the meeting.  The AJ stated that the typewritten notes
were contemporaneous, but Plaintiff argues that was only an
assumption.  Plaintiff therefore argues that the typewritten
notes cannot be considered reliable evidence of Plaintiff's
statements at the day in court meeting.

####    B.    **Motion for Summary Judgment**

In the Motion, Defendants argue that Plaintiff cannot
establish a prima facie case of disparate treatment disability
discrimination because there is no evidence that he is disabled
for purposes of the Rehabilitation Act.  There is no indication
that Plaintiff's physical ailments limit his major life
activities.  Defendants also argue that there is no evidence that
Plaintiff was removed because of his disability.  Defendants
assert that Plaintiff's removal was based solely upon his
movement of the security cameras, which was a breach of trust.
Moreover, there is no evidence that Mr. Yokoyama and Mr. Sakagawa
even knew about Plaintiff's disability.

Defendants also argue that Plaintiff cannot establish a
prima facie case of hostile work environment because Plaintiff
was removed for his misconduct.  Further, there is no evidence
that anyone in the Agency's management was motivated by
Plaintiff's disability.

Plaintiff filed his memorandum in opposition to the
Motion on October 23, 2008.  Plaintiff states that his conditions

caused him to: need light duty; take many daytime hours off to attend rehabilitation and therapy sessions; and frequently miss work altogether.  He was unofficially granted accommodations for this through liberal use of his sick and annual leave and leave without pay.  He was also granted a schedule change in 2002. During 2002, Plaintiff frequently called in sick, sometimes twice a week, pursuant to medical advice because of elevated blood pressure readings.  Plaintiff did not have any problems related to his leave until the time period at issue in this case.

The proposing official, Mr. Sano, testified during his deposition that he was aware that Plaintiff changed schedules to "go to something for his health." [Mem. in Opp, Decl. of Elbridge W. Smith ("Smith Decl."), Exh. 2 (Excerpts of Trans. of 9/25/03 Depo. of Eugene Sano) ("Sano Depo.") at 9.]  He was also aware that Plaintiff had a zero, or near zero, leave balance because he had a health problem.  [Id. at 44.]  Mr. Sano stated that from October 2002 to March 2003, Plaintiff "hardly came to work." [Id. at 70.]  Before deciding to propose removal, Mr. Sano reviewed Plaintiff's attendance record, but he testified that it had "nothing to do with" his decision.  [Id. at 71.]

The deciding official, Mr. Sakagawa, testified during his deposition that Plaintiff was absent more than necessary, even if the absences were legitimate.  Mr. Sakagawa acknowledged that Plaintiff may have had personal problems, but Mr. Sakagawa

was not specifically aware of any.  When asked to evaluate
Plaintiff's performance, Mr. Sakagawa said that it was poor
because of his attendance and the incident in question.  [Smith
Decl., Exh. 3 (Excerpts of Trans. of 9/24/03 Depo. of Glen
Sakagawa) ("Sakagawa Depo.") at 36-39.]  When asked about
Plaintiff's disciplinary record, Mr. Sakagawa testified that it
was not good because Plaintiff did not have a leave balance,
despite his many years of service.  [Id. at 68.]  Mr. Sakagawa
also testified that he did not consider any mental impairments,
personality problems, or job tensions as mitigating factors in
this case.  [Id. at 85.]

        At issue in the Motion is whether Plaintiff's removal
was motivated by discriminatory animus because of his medically
necessary work absences.  Plaintiff argues that summary judgment
is not appropriate because there are genuine issues of fact.
Plaintiff contends that Mr. Sakagawa did not consider lesser
penalties because he regarded Plaintiff as having a poor
disciplinary record due to his absences.  Plaintiff, however, had
no prior disciplinary problems in his twenty-one years of
service.  Plaintiff also argues that the increase in his job
responsibilities after his suspension is inconsistent with the
allegation that he breached the Agency's trust.  Plaintiff argues
that issues of intent or motivation are generally inappropriate
for summary judgment because they are issues of fact.

Plaintiff contends that he has established a prima facie case of disparate treatment.  He is disabled; he is qualified to do his job (with or without reasonable accommodation); and he suffered adverse employment action because of his disability.  Plaintiff argues that Defendants have never disputed his claim that he has hypertension, cardiovascular disease, and depression.  These impairments substantially limit one ore more of his life activities.  Further, Defendants have never contested Plaintiff's claim that he is qualified to do his job, in spite of his poor attendance for medical reasons.  There is no evidence in the record that Plaintiff's superiors ever objected to Plaintiff's medical absences, nor is there evidence that Plaintiff's job performance, apart from the incident in question, was unsatisfactory.

Plaintiff argues that, under Ninth Circuit case law, all that is required to prove the "because of" element is that animus based on his disability or based on a request for accommodation be a motiving factor in his removal.  Plaintiff emphasizes that Mr. Sakagawa testified that he considered Plaintiff's absences to be excessive and that he believed Plaintiff had a poor disciplinary record because of his absences. Plaintiff contends that this is sufficient to create a genuine issue of material fact as to discriminatory intent.  Plaintiff argues that the Agency unofficially accommodated Plaintiff's

disability by allowing him liberal leave usage, but Mr. Sakagawa used that accommodation to justify Plaintiff's removal. Plaintiff therefore argues that this Court should deny the Motion.

Defendants filed their reply on October 30, 2008. Defendants argue that the Court should dismiss Plaintiff's claims because he cannot establish the "because of" element.  Although both Mr. Sano and Mr. Sakagawa reviewed Plaintiff's attendance, it did not motivate their decisions.  Defendants argue that the Notice of Proposed Removal states that "Since October 23, 2002 you have been irregular in attendance and you have not made any attempt to return to the Inspection Service office for an interview."  [SER at 96.]  Defendants argue that this shows that Mr. Sano only considered Plaintiff's attendance to determine if Plaintiff was able to cooperate in the investigation.  They also point out that Mr. Sakagawa only considered Plaintiff's attendance record after the union steward approached him about a last chance agreement.  [Reply, Decl. of Edric M. Ching, Exh. J (Excerpts of Trans. of 9/24/03 Depo. of Glen Sakagawa) at 34-35.] Defendants argue that this and any other attempts to settle the matter should be deemed inadmissible pursuant to Federal Rule of Evidence 408.

In addition, Defendants argue that it was proper for Mr. Sakagawa to consider Plaintiff's attendance and job

27

performance as part of the <u>Douglas</u> analysis.  Mr. Sakagawa asked the union representative to provide him with mitigating information, including factors like good conduct, reporting on time, and quality work product.  Mr. Sakagawa ultimately concluded that Plaintiff's work quality and attendance were poor. Defendants also argue that there is no evidence that either Mr. Sano or Mr. Sakagawa considered times in which Plaintiff requested reasonable accommodations, such as light duty or change in schedule.  Defendants contend that Mr. Sakagawa only considered Plaintiff's attendance in determining whether a lesser penalty would be appropriate and that such consideration was proper.  Mr. Sakagawa expressly testified that he did not fire Plaintiff for poor attendance.  [Defs.' CSOF, Exh. B (Excerpts of Trans. of 10/20/03 MSPB hearing) ("Hearing Trans.") at 89.] Defendants also note that there is no evidence that Plaintiff's absences after the incident in question were caused by the same conditions that prompted his request for a schedule change. Further, there is no evidence that Plaintiff and the Agency had any kind of interactive process concerning his requests for medical-related absences.

Even assuming, *arguendo*, that Plaintiff established a prima facie case, Defendants argue that Plaintiff failed to establish that Defendants' legitimate, non-discriminatory reason for his removal was pretextual.  Defendants note that Plaintiff

28

does not deny that he moved the cameras and that the MSPB found
that the sustained charge was sufficient to support removal.
Defendants argue that it is clear that Mr. Sano's and Mr.
Sakagawa's actions were based on Plaintiff's movement of the
cameras and Plaintiff's failure to cooperate with the
investigation.  Plaintiff provided no evidence that they did not
honestly believe the reasons for the recommendation and decision.
Defendants argue that, even if the removal decision was
ultimately wrong, that alone does not establish pretext.

Defendants point out that Plaintiff failed to address
his hostile work environment claim in his opposition to the
Motion.  They argue that this precludes him from presenting any
evidence on the issue and therefore, this Court must dismiss the
claim.

## STANDARD

Although MSPB decisions generally must be appealed to
the Federal Circuit Court of Appeals, district courts have
jurisdiction to hear "mixed" cases, *i.e.* cases involving both a
MSPB appeal and a discrimination claim.  See <u>Coons v. Sec'y of
United States Dep't of Treasury</u>, 383 F.3d 879, 884 (9th Cir.
2004); <u>see also</u> 5 U.S.C. § 7703(b)(2).

## I.   MSPB Appeal

In ruling upon Plaintiff's MSPB appeal, this Court must

> review the record and hold unlawful and set aside
> any agency action, findings, or conclusions found

> to be--
>> (1) arbitrary, capricious, an abuse of
>> discretion, or otherwise not in accordance
>> with law;
>> (2) obtained without procedures required by
>> law, rule, or regulation having been
>> followed; or
>> (3) unsupported by substantial evidence;
>> except that in the case of discrimination brought
>> under any section referred to in subsection (b)(2)
>> of this section, the employee or applicant shall
>> have the right to have the facts subject to trial
>> de novo by the reviewing court.

5 U.S.C. § 7703(c).  Thus, in reviewing the MSPB's decision, this

Court must determine whether the MSPB applied the correct legal

standards, and whether its findings are supported by substantial

evidence.  See Washington v. Garrett, 10 F.3d 1421, 1428 (9th

Cir. 1993); see also Lawrence v. Dep't of Interior, 525 F.3d 916,

920 (9th Cir. 2008) (stating that the Court of Appeals applies

the same standard of review to the MSPB's decision as the

district court does).  "Substantial evidence means more than a

mere scintilla, but less than a preponderance."  Young v.

Sullivan, 911 F.2d 180, 183 (9th Cir. 1990) (citations and

quotation marks omitted).  The Court must consider both the

evidence in the record that supports the MSPB's decision and the

evidence that undermines it.  See Washington, 10 F.3d at 1428.

This Court, however, must not reverse the AJ's decision "between

two fairly conflicting views, even though the court would

justifiably have made a different choice had the matter been

before it de novo."  Universal Camera Corp. v. N.L.R.B., 340 U.S.

30

474, 488 (1951).

## II. __Motion for Summary Judgment__

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See MetroPCS, Inc. v. City & County of San Francisco, 400 F.3d 715, 720 (9th Cir. 2005).  There is no genuine issue of material fact if, based on the record as a whole, a rational trier of fact could not find for the non-moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings." W. Sunview Props., LLC v. Federman, 338 F. Supp. 2d 1106, 1114 (D. Haw. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

If the moving party meets its burden, the non-moving party must then present evidence that there is a genuine issue of material fact for trial.  In considering a motion for summary judgment, a court must resolve all disputed issues of fact in favor of the non-moving party.  See MetroPCS, 400 F.3d at 720. Further, "[i]n ruling on a motion for summary judgment, the court

31

must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law." W. Sunview, 338 F. Supp. 2d at 1114 (citation omitted). "[S]ummary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" Broussard v. Univ. of Cal. at Berkeley, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting Celotex, 477 U.S. at 322).

   **A.   Disparate Treatment Disability
          Discrimination Claim under the Rehabilitation Act**

      The standards applicable under the Americans with Disabilities Act ("ADA") apply to Plaintiff's disability discrimination claims under the Rehabilitation Act. See Coons, 383 F.3d at 884 (citing 29 U.S.C. § 794(d)) (some citations omitted). In order to establish a prima facie case of disparate treatment disability discrimination under the ADA, Plaintiff must prove that: 1) he is a person with a disability under the ADA; 2) he is a qualified individual who can perform the essential functions of his job, with or without reasonable accommodations; and 3) he suffered an adverse employment action because of his disability. See Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1133 (9th Cir. 2001).

      In determining whether Plaintiff was discriminated against because of his disability, this Court must apply the two-pronged scheme set forth by the Second Circuit and adopted by the

Ninth Circuit.  See Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1175 (9th Cir. 1998).

> Under this scheme, if the employer disclaims any reliance on the employee's disability in having taken the employment action, McDonnell Douglas Title VII disparate impact analysis should be used to determine if the employer's reason is pretextual.  Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511, 514-16 (2d Cir.1991), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  On the other hand, if the employer acknowledges reliance on the disability in the employment decision, the employer bears the burden of showing that the disability is relevant to the job's requirements. Id. at 514-515.

Id. at 1175-76.  In the present case, Defendants deny any reliance on Plaintiff's asserted disability in the decision to remove him.  Thus, assuming that Plaintiff can establish a prima facie case, to survive Defendants' motion for summary judgment, Plaintiff bears the burden of raising "a triable issue of fact as to pretext".  See Noyes v. Kelly Servs., 488 F.3d 1163, 1165 (9th Cir. 2007).

## B.  Hostile Work Environment Claim under the Rehabilitation Act

In order to establish a prima facie case of hostile work environment disability discrimination, Plaintiff must show that: 1) Defendants subjected him to unwelcome conduct; 2) the conduct was based on his disability; and 3) "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  Surrell

33

v. Cal. Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir. 2008)
(citation omitted).  It is not enough that a plaintiff
subjectively perceives the working environment as abusive; the
environment must also be objectively perceived as abusive.  See
Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1055 (9th Cir.
2007).  "Objective hostility is determined by examining the
totality of the circumstances and whether a reasonable person
with the same characteristics as the victim would perceive the
workplace as hostile."  Id. (citation omitted).

### DISCUSSION

### I.   MSPB Appeal

In his appeal of the MSPB's decision, Plaintiff raises
the following points of error: 1) the AJ should not have made a
determination as to Plaintiff's credibility because it was not
required to uphold the specification of unauthorized
repositioning of the security cameras;[13] 2) the AJ's adverse
credibility finding did not have a sufficient factual basis; 3)
the AJ failed to consider all of the applicable mitigating
factors; and 4) the penalty of removal was too harsh.

#### A.   Credibility

Plaintiff first argues that the AJ should not have made
a credibility determination in upholding the charge of

---

[13] Insofar as the MSPB denied Plaintiff's petition for
review and the Initial Decision became the final decision of the
Board, this Court must review the Initial Decision.

34

unauthorized repositioning of the security cameras because it did not require a finding of intent.  Plaintiff did not dispute that he moved the cameras and that he was not authorized to do so. Thus, the AJ did not need to assess the credibility of Plaintiff's testimony about the circumstances surrounding the movement of the cameras.  [Initial Decision at 10 ("I do not find the appellant's testimony concerning the movement of the cameras to be credible.").]  Plaintiff argues that this error was prejudicial because the AJ used the adverse credibility determination to justify a more severe penalty than would have been warranted otherwise.  Plaintiff's argument is misplaced.

The AJ noted that Plaintiff was charged with "unauthorized repositioning of four security cameras on October 12, 2002" and with failing to cooperate with the official investigation thereof.[14]  [Initial Decision at 7.]  First, Plaintiff acknowledges that numerous credibility determinations and observations were part of the AJ's decision not to sustain the failure to cooperate charge.  [Opening Brief at 30.] Plaintiff, however, apparently contends that the AJ should have ignored any credibility concerns regarding the unauthorized movement charge because, in Plaintiff's view, it is essentially a strict liability offense.  Even assuming, *arguendo*, that the

---

[14] There was one charge of unacceptable conduct with two specifications.  [SER at 95.]

adverse credibility finding was unnecessary to sustain the charge, whether Plaintiff intentionally moved the cameras was certainly relevant to the AJ's ruling on the appropriate penalty for the offense.  Thus, the credibility of Plaintiff's testimony regarding the movement of the cameras was relevant, and the AJ did not err in considering Plaintiff's credibility as to that charge.

Further, the Agency's May 9, 2003 Letter of Decision - Removal stated that Plaintiff's offense was "deliberately repositioning four security video cameras[.]"  [SER at 86.] Thus, insofar as the Agency's ultimate decision to remove Plaintiff was based on a finding that he deliberately moved the cameras, it was proper for the AJ to determine the credibility of Plaintiff's testimony about whether the movement was deliberate.

Plaintiff next argues that the record does not support the AJ's finding that his testimony about the movement of the cameras was not credible.

> An ALJ's findings as to credibility are entitled
> to considerable deference.  But "[w]hile it is
> true that ordinarily the question of credibility
> is left to the [ALJ], this is not an inflexible
> rule and will not be enforced if the credibility
> determination is inherently improbable or
> discredited by undisputed fact."

Washington, 10 F.3d at 1430 (quoting Grubka v. Department of the Treasury, 858 F.2d 1570, 1574 (Fed. Cir. 1988) (reviewing MSPB decision)) (some citations omitted) (alterations in original).

In making this adverse credibility finding, the AJ first noted that, during the day in court meeting, Plaintiff initially denied knowing that he moved the cameras while trying to clean them.[15]  [Initial Decision at 10.]  This is inconsistent with the following portions of Plaintiff's testimony before the AJ: after the cameras moved while Plaintiff was trying to clean them, he looked for a ladder to reposition them; after camera 3 moved, he got a broom with longer bristles to try to reposition it; when he accidentally moved camera 14, it swung so much that he thought it would fall; and that he may have told another employee that the cameras were out of position.  [Id. at 9.]  The AJ stated that he though it was "highly unlikely that the appellant's memories of these events would have improved with the passage of time."  [Id. at 10.]  The AJ also stated that it was "inherently incredible" that an employee who accidentally moved two cameras one day would return the next day and repeat his actions four more times.  [Id.]  This Court agrees with the AJ.  The AJ also noted that the videotape from camera 14 showed that Plaintiff "us[ed] considerable force and appear[ed] to be striking at the camera, rather than merely dusting cobwebs."  [Id. at 11.]  Further, although Plaintiff claimed that one of the

---

[15] The AJ also noted that Plaintiff denied that he was the person in the videotape, but the AJ gave this little weight because Plaintiff did not have access to the tape during the day in court meeting and Plaintiff was only responding to a description of the tape.  [Initial Decision at 10 n.19.]

cameras swung violently after he accidentally moved it, none of
the videotapes show significant movement once the camera was out
of position.  Plaintiff argues that the movement would not appear
on the videotape because the cameras use a time-lapse filming
method instead of a real-time filming method.  The AJ considered
this argument and rejected it.  [Id. at 11 & n.22.]  Finally, the
AJ noted that the videotapes from other cameras show that
Plaintiff was only in the vicinity of the repositioned cameras
"for a very brief period of time, which is not consistent with
trying to reposition a camera after accidentally moving it."
[Id. at 11-12.]  Thus, the AJ identified specific reasons for his
adverse credibility finding and, based on this Court's review of
the record, the Court finds that the AJ's reasons are supported
by the record.

        Plaintiff also argues that the AJ's adverse credibility
finding is not supported by the record because the AJ found
Plaintiff to be credible in every other instance.  That fact
alone, however, does not mean that the adverse finding was
erroneous.  In fact, the single adverse finding amongst the other
favorable credibility findings indicates that the AJ carefully
considered Plaintiff's credibility on each subject and made
separate decisions based on the facts of each subject, rather
than making a generalized credibility finding on the record as a
whole.

This Court cannot find that the AJ's adverse
credibility finding is inherently improbable or discredited by
undisputed fact.  The AJ did not commit reversible error in
making an adverse credibility finding as to Plaintiff's testimony
about the movement of the cameras.

B. **Mitigating Factors**

Plaintiff next argues that the AJ committed reversible
error because he failed to consider all of the applicable
mitigating factors.  An agency must generally follow its own
precedential decisions.  See McClaskey v. United States Dep't of
Energy, 720 F.2d 583, 587 (9th Cir. 1983) (citing Atchison,
Topeka & Santa Fe Railway v. Wichita Board of Trade, 412 U.S.
800, 807-08 (1973)) (some citations omitted).  In Douglas v.
Veterans Administration, the MSPB articulated a number of factors
that are generally relevant when determining whether a penalty is
appropriate:

> (1) The nature and seriousness of the
> offense, and its relation to the employee's
> duties, position, and responsibilities, including
> whether the offense was intentional or technical
> or inadvertent, or was committed maliciously or
> for gain, or was frequently repeated;
>
> (2) the employee's job level and type of
> employment, including supervisory or fiduciary
> role, contacts with the public, and prominence of
> the position;
>
> (3) the employee's past disciplinary record;
>
> (4) the employee's past work record,
> including length of service, performance on the

39

job, ability to get along with fellow workers, and
dependability;

(5) the effect of the offense upon the
employee's ability to perform at a satisfactory
level and its effect upon supervisors' confidence
in the employee's ability to perform assigned
duties;

(6) consistency of the penalty with those
imposed upon other employees for the same or
similar offenses;

(7) consistency of the penalty with any
applicable agency table of penalties;

(8) the notoriety of the offense or its
impact upon the reputation of the agency;

(9) the clarity with which the employee was
on notice of any rules that where violated in
committing the offense, or had been warned about
the conduct in question;

(10) potential for the employee's
rehabilitation;

(11) mitigating circumstances surrounding the
offense such as unusual job tensions, personality
problems, mental impairment, harassment, or bad
faith, malice or provocation on the part of others
involved in the matter; and

(12) the adequacy and effectiveness of
alternative sanctions to deter such conduct in the
future by the employee or others.

5 M.S.P.R. 280, 305-06 (1981).  These factors are not exhaustive,

and not all of the factors will apply in every case.  See id.

Thus, the MSPB is not required to consider all of the factors in

every case; it need only consider the relevant factors.

See McClaskey, 720 F.2d at 588 (citing Nagel v. Department of

Health and Human Services, 707 F.2d 1384, 1386 (Fed. Cir.

1983)).]

> The board never intended that each factor be
> applied mechanically, nor did it intend mandatory
> consideration of irrelevant factors in a
> particular case, or that it should be reversible
> error not to state expressly that a factor was
> considered and found irrelevant. . . . [T]he
> *Douglas* decision correctly states that neither
> statute nor regulation *requires* an agency to
> demonstrate that it considered all mitigating
> factors.

Nagel, 707 F.2d at 1386 (emphasis in original).

The AJ clearly applied Douglas.  In fact, he found that

the Agency's decision to impose removal was not entitled to

deference because Mr. Sakagawa did not properly consider

mitigating factors.  The AJ, however, based on his own review,

concluded that removal was reasonable.  [Initial Decision at 24-

25.]  Although he did not list the Douglas factors, the AJ

expressly considered the following fact that are relevant to the

Douglas factors:

-the seriousness of the offense (factor 1);
-the trust put in custodians and their virtually unlimited access
     to the facility and the fact that such access is broader
     than the access allowed to other non-management personnel
     (factors 1 and 2);
-Plaintiff deliberately moved the cameras (factor 1);
-Plaintiff moved four cameras on the date in question after
     moving two the day before and after one of the four
     allegedly swung so violently that he thought it would fall
     (factor 1);
-Plaintiff's years of service (factor 4); and
-the lack of any prior disciplinary record (factor 3).

[Initial Decision at 10, 25.]  In this Court's view, the AJ's

emphasis on the trust placed in custodians and Plaintiff's breach

of that trust is relevant to Plaintiff's ability to perform his
job at a satisfactory level and to the employer's confidence in
Plaintiff (Douglas factor 5).  Plaintiff's position is that he
accidentally moved the cameras while attempting to clean them and
he testified that he would never try to clean the security
cameras again.  Even accepting Plaintiff's position, his failure
to realize the possible ramifications of his actions could
indicate that he may have other lapses of judgment in the future
that would breach the trust placed in custodians, with
potentially serious consequences.  This would affect his ability
to perform his job at a satisfactory level and the employer's
confidence in him.  It arguably also indicates that
rehabilitation may not be possible and that lesser sanctions may
not be warranted (Douglas factors 10 and 12).

    There is no indication that other Agency employees have
committed the same or similar offense, or that there is an
applicable table of penalties.  Thus, consistency with these
(Douglas factors 6 and 7) was not relevant and the AJ did not
have to consider those factors.  If there were other offenses or
an agency table, Plaintiff did not point them out in the instant
appeal.[16]  Plaintiff points only to the applicable CBA, which

---

[16] The Court notes that the Supervisor's Worksheet for
Disciplinary Action, signed by Eugene Sano on April 8, 2003,
states that there were no similar offenses involving other
employees.  [SER at 101.]

states a general principle that discipline should be corrective rather than punitive. This, however, does not rise to the level of a table of penalties.

Plaintiff's offense was not notorious and there is no indication that it affected the Agency's reputation. Thus, Douglas factor 8 could be seen as favoring mitigation. Lapses in the Agency's security surveillance system, however, could adversely affect the Agency's reputation. Insofar as Factor 8 can be construed in favor of Plaintiff and against him, it could be seen as a neutral factor.

Douglas factor 9 can also been seen as neutral. There was evidence that all employees were informed of the new security system during a February 16, 2001 meeting and that Plaintiff attended that meeting. However, there was no evidence of exactly what the employees were told about the new system.

Plaintiff does not contend that Douglas factor 11 was a relevant factor that the AJ should have considered. [Opening Brief at 25-29 (discussing Douglas factors that the AJ failed to consider).] Further, there is no evidence in the record of "unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter[,]" see Douglas, 5 M.S.P.R. at 305, which contributed to the offense.

Based on this Court's review of the record and the

43

relevant <u>Douglas</u> factors, the Court finds that there was no reversible error in the AJ's, and ultimately the MSPB's, discussion of the factors that it deemed relevant.

## C.   <u>Disproportionate Penalty</u>

Plaintiff argues that the penalty of removal was too harsh in light of his status as a disabled veteran, his twenty-one years of service, and the fact that this was his first offense of any kind.  The scope of a district court's review of the penalty imposed by the MSPB is very narrow.  <u>See</u> <u>Filiberti v. Merit Sys. Protection Bd.</u>, 804 F.2d 1504, 1510 (9th Cir. 1986). The court must defer to the MSPB's judgment in selecting an appropriate penalty "unless the penalty is so disproportionate to the offense as to constitute an abuse of discretion."  <u>Morales v. Merit Sys. Protection Bd.</u>, 932 F.2d 800, 802 (9th Cir. 1991). Where the challenged penalty is dismissal, the employee must establish that the offense he committed was minor.  <u>See</u> <u>id.</u> (citing <u>McClaskey v. United States Dept. of Energy</u>, 720 F.2d 583, 586 (9th Cir. 1983)).

The AJ sated that "[t]he unauthorized movement of security cameras is a serious matter[,]" and that Plaintiff's interference with the security system breached the trust that the Agency places in its custodians, who have virtually unlimited access to the facility.  [Initial Decision at 25-26.]  This Court agrees.  Plaintiff argues that his offense was minor because

44

there is no evidence that he moved the cameras as part of some
nefarious plan and there is no evidence that anything untoward
happened while the cameras were out of position.  Even if this
Court accepted Plaintiff's innocent explanation for his movement
of the cameras, that does not minimize his offense.  He
intentionally attempted to clean the cameras even though he knew
or should have known, based on his experience the day before,
that it would cause the cameras to change position.  His
intentional actions left four security cameras out of position,
"prevent[ing] the monitoring and taping of the entrances and
exits."  [SER at 86.]  This "compromised the security system" at
the facility, "prevented the Postal Service from satisfactorily
performing due diligence in monitoring and preventing acts of
terror and violence against its employees", and "compromised the
safeguarding of mail and postal assets."  [Id.]  That none of
these potential dangers happened that day was fortunate; it does
not render Plaintiff's offense minor.

       While Plaintiff's twenty-one years of service, veteran
status, and lack of a prior disciplinary record could have been
found to outweigh his offense, this Court cannot find that the
penalty of removal was so disproportionate to Plaintiff's
offenses of unauthorized movement of the security cameras as to
constitute an abuse of discretion.  Cf. Morales, 932 F.2d at 802
(stating that the plaintiff "could have been going through a bad

patch; his long service could have been found to outweigh his recent difficulties.  But neither the district court nor we could say that there was an abuse of discretion in the drastic penalty applied.").

Plaintiff also argues that his removal violated the requirement of progressive discipline.  Plaintiff first argues that progressive discipline is "an established preference in federal employment."  [Opening Brief at 22 (citing Bolling v. Dep't of the Air Force, 9 M.S.P.R. 335, 340 (1981)).]  Although the MSPB in Bolling noted that the offense at issue was the employee's fifth disciplinary offense in two years, including a prior offense that was the same as the offense at issue, and that lesser penalties had been ineffective, nothing in Bolling expressly establishes a requirement of, or even a preference for, progressive discipline in all federal employment.  See 9 M.S.P.R. at 341-42.[17]  The Ninth Circuit has noted that the specifics of an employer's adoption of a progressive discipline principle "are a matter of choice, custom, or bargaining, not judicial

---

[17] The Court notes that the MSPB has cited Bolling for the "the established preference for progressive discipline in Federal employment."  See Cosgrove v. Dep't of Navy, 59 M.S.P.R. 618, 624 (1993) (citing Bolling, 9 M.S.P.R. at 340).  Even assuming, arguendo that Bolling does set forth such a preference, the preference does not constitute an unequivocal prohibition of removal as a penalty for a first offense.

prescription from an empty record."[18]   McClaskey, 720 F.2d at 588 n.2.

Plaintiff argues that the applicable CBA "acknowledges that 'a basic principle shall be that discipline should be corrective in nature, rather than punitive.'"   [Opening Brief at 22 (quoting Collective Bargaining Agreement, Record on Appeal, Part III (dkt. no. 39-7), Vol. 2, Tab 25 ("Collective Bargaining Agreement"), Article 16, Section 1).]   The Court first notes that the Record on Appeal does not contain the entire text of Article 16.1.   The Record on Appeal contains only the following portion of Article 16.1: "In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive.   No employee may be disciplined or discharged except for just cause such as, but not limited to . . . ."   [Collective Bargaining Agreement at 109.]   The next page is not included in the Record on Appeal.   This Court cannot find that this portion of Article 16.1 imposes a requirement that the Agency impose progressive discipline before discharging an employee for just cause.   In the present case, the Agency had just cause to remove Plaintiff.   Thus, there is no indication that Plaintiff's removal violated the CBA.

---

[18] The Ninth Circuit made this observation in rejecting the dissenting opinion's argument that dismissal should only be imposed for the most serious offenses and only after lesser penalties have been ineffective.   See McClaskey, 720 F.2d at 588 n.2.

This Court therefore finds the AJ, and ultimately the MSPB, applied the correct legal standards and that their findings are supported by substantial evidence.  They did not commit reversible error in affirming the Agency's decision to remove Plaintiff.  The MSPB's decision is therefore AFFIRMED.

## II.  **Motion for Summary Judgment**

### A.   **Rehabilitation Act - Disparate Treatment Claim**

#### 1.   **Prima Facie Case**

Under the ADA, a person has a disability if he: "(1) has a physical or mental impairment that substantially limits one or more of [his] major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Coons, 383 F.3d at 884 (citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)) (some citations omitted).

Plaintiff argues that he is disabled because he has hypertension, cardiovascular disease, and depression.  [Mem. in Opp., Decl. Russell D. Henion ("Henion Decl.") at ¶ 3.]  He had three heart attacks in and around April 1998 and underwent triple bypass surgery.  As a result of his hypertension and cardiovascular disease, his circulatory system is substantially impaired.  Plaintiff states that, between 1998 and the beginning of 2003, he suffered chest pains, premature ventricular contractions, and breathing episodes as often as once every couple of days.  He also experienced dizziness, shortness of

48

breath, fatigue, and headaches.  Plaintiff's physician instructed

him to lay down until his symptoms subsided and his blood

pressure stabilized.  Plaintiff's physician restricted him from

walking more than twenty minutes at a time, lifting heavy items,

climbing, or doing any activity that requires him to be high off

of the ground.  Plaintiff states that he was frequently absent

from work because of his medical conditions, often twice per

week, and sometimes more.  Plaintiff therefore exhausted all of

his sick leave and annual leave and was frequently on leave

without pay status.  [Id. at ¶¶ 8-11, 13-14.]  Plaintiff takes

Bupropion for his depression.  [Id. at ¶ 4.]  His depression

causes him to experience

> symptoms of anxiety, social withdrawal from
> friends and family, depressed mood, feelings of
> hopelessness, sleeplessness, increased
> irritability, fatigue, reduced focus and
> concentration and reduced libido, loss of interest
> in formerly pleasurable activities such as diving,
> dancing, body surfing, spear fishing, tennis,
> soccer, coaching and officiating soccer games . .
> . , camping, Den Leader for Cup (sic) Scouts and
> walking outdoors with family members.

[Id. at ¶ 12.]  Plaintiff asserts that he never needed to

formally request accommodation for his disability.  The Agency

allowed him time off when he was symptomatic and placed him on

light duty status beginning in October 1998.  [Id. at ¶ 15.]  He

also testified that around the summer of 2002, he received a

change in his work schedule to allow him to attend physical

therapy appointments related to his cardiac rehabilitation.

[Smith Decl., Exh. 1 (Excerpts of Trans. of 9/25/03 Depo. of
Russell D. Henion) ("Henion Depo.") at 38.]

At the hearing on the Motion, counsel for Defendants
conceded that the Agency granted Plaintiff accommodations for his
disability by granting him light duty status and by allowing him
to change his work schedule to allow him to attend various
appointments related to his condition.[19]  Defendants, however,
deny Plaintiff's claim that the Agency granted him an
accommodation by allowing him liberal use of leave.  Based on
counsel's representation, the Court finds, for purposes of the
instant Motion, that Plaintiff is a person with a disability
under the ADA.

Further, there is no evidence in the record that
Plaintiff is not qualified to perform the essential functions of
his position.[20]  This Court therefore finds, for purposes of the
instant Motion, that Plaintiff is qualified to perform the
essential functions of his position with or without a reasonable

_____

[19] The Court notes that Plaintiff's assignment to light duty
was apparently a permanent accommodation, [Henion Decl. at ¶ 15,]
but the schedule change was temporary.  [Sano Depo. at 9.]

[20] The Court notes that the Letter of Decision emphasizes
that Plaintiff's custodial position was a position of trust and
that Plaintiff's conduct removed the Agency's confidence in his
ability to perform his duties.  [Defs.' CSOF, Exh. A at 1.]
Although this is arguably evidence that the Agency did not
consider Plaintiff qualified to perform his duties, insofar as it
relates to the unauthorized movement of the security cameras, the
Court considers this as part of Defendants' proffered legitimate,
non-discriminatory reason for Plaintiff's removal.

accommodation.  The crux of the Motion is whether Plaintiff has raised a triable issue of fact as to whether he was removed because of his disability.

The Ninth Circuit has held that the ADA's "because of" language does not require that the plaintiff's disability have been the sole cause of discriminatory conduct.  Where the evidence could support a finding that discrimination was one of two or more reasons for the adverse employment decision, at least one of which may have been legitimate, the plaintiff need only prove that his disability was a motivating factor.  See Head v. Glacier Nw. Inc., 413 F.3d 1053, 1065-66 (9th Cir. 2005).

Eugene Sano, the proposing official, acknowledged that he knew Plaintiff had a zero, or near zero, leave balance. Mr. Sano, however, also testified that he did not consider Plaintiff's leave use to be abusive because he knew Plaintiff had health problems.  [Sano Depo. at 44.]  Mr. Sano acknowledged that he looked at Plaintiff's poor attendance record from October 2002 to March 2003 before recommending Plaintiff's removal.  [Id. at 70-71.]  The remainder of Mr. Sano's testimony on the issue, however, clearly shows that he considered Plaintiff's attendance in the context of the failure to cooperate charge.  Mr. Sano testified that during those months, there was no time that he could have asked Plaintiff whether he attempted to return to give the inspectors a statement about the camera investigation.  [Id.

at 72.]  The Notice of Proposed Removal itself only discusses Plaintiff's attendance in the context of his cooperation with the investigation.  [SER at 96 ("Since October 23, 2002 you have been irregular in attendance and you have not made any attempt to return to the Inspection Service office for an interview.").] This Court therefore finds that there is no evidence that Plaintiff's disability was a motivating factor in the decision to propose his removal.

Mr. Sakagawa, the deciding official, testified that he believed Plaintiff had a poor attendance record and that he believed Plaintiff was absent more than necessary.  Mr. Sakagawa acknowledged that there may be legitimate excuses, but he stated that the bottom line is that, when a person is absent, someone else has to perform that person's duties.  [Sakagawa Depo. at 36-37.]  Mr. Sakagawa also testified that he believed that Plaintiff's past disciplinary record was not good because he had a zero leave balance in spite of his many years of service.  Mr. Sakagawa, however, testified during his deposition that he did not consider Plaintiff's disciplinary record in deciding to remove Plaintiff.  [Id. at 68.]  He also testified during the hearing before the AJ that he did not fire Plaintiff for poor attendance.  [Hearing Trans. at 89.]  The Letter of Decision itself makes no reference to Plaintiff's poor attendance. [Defs.' CSOF, Exh. A.]

Further, even if Mr. Sakagawa did consider Plaintiff's poor attendance record in his decision to remove Plaintiff, there is no evidence that this amounted to a consideration of Plaintiff's disability.  First, although Plaintiff claims that the Agency granted him an unofficial accommodation for his disability consisting of liberal leave usage, Plaintiff has no evidence of this other than his declaration.  [Henion Decl. at ¶ 15.]  This is not enough to create a genuine issue of material fact as to whether Mr. Sakagawa's decision to remove Plaintiff was motivated at least in part by Plaintiff's disability.  <u>See Nilsson v. City of Mesa</u>, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact" (citation and quotation marks omitted) (alteration in original)).  Mr. Sakagawa testified that he did not look into all of the circumstances of Plaintiff's poor attendance record.  Some of the reasons Mr. Sakagawa discussed for Plaintiff's absence were: "personal problems", [Sakagawa Depo. at 38-39,] including unspecified things going on in life and with his family, [<u>id.</u> at 85;] Plaintiff going to school, [<u>id.</u> at 39;] and attending a union conference.  [Hearing Trans. at 88.]  Thus, unlike Mr. Sano, there is no evidence before the Court that Mr. Sakagawa knew that Plaintiff's absences were caused by his disability.  The Court therefore finds that

53

Plaintiff's disability was not a motivating factor in Mr. Sakagawa's decision to remove Plaintiff.

Having reviewed the record in the instant case, this Court FINDS that Plaintiff has failed to raise a triable issue of fact as to whether he was removed "because of" his disability. The Court therefore CONCLUDES that Plaintiff cannot establish a prima facie case of disparate treatment disability discrimination.

### 2. **Legitimate, Non-Discriminatory Reason**

Even assuming, *arguendo*, that Plaintiff can establish a prima facie case of disparate treatment disability discrimination, this Court finds that the sustained charge of unauthorized movement of the security cameras is a legitimate, non-discriminatory reason for Plaintiff's removal.  As noted, *supra*, Mr. Sakagawa, the deciding official, testified at the administrative hearing and during his deposition that his decision to remove Plaintiff was not based on Plaintiff's poor attendance.  Insofar as Defendants disclaim any reliance on Plaintiff's disability, this Court will apply the McDonnell Douglas burden-shifting analysis.  See Mustafa, 157 F.3d at 1175. It is therefore Plaintiff's burden to demonstrate at trial that Defendants' reason for his removal was pretextual.  See id. at 1176.

### 3. **Pretext**

Plaintiff argues that he has met his burden to establish a triable issue of fact as to pretext where "the Deciding Official admits to using Plaintiff's medical condition approved absences against him in his decision to fire Plaintiff." [Mem. in Opp. at 14.]  A plaintiff "may demonstrate pretext either directly by persuading the court that a discriminatory reason likely motivated [the defendant] or indirectly by showing that [the defendant's] proffered explanation is unworthy of credence."  Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1212 (9th Cir. 2008) (citation and quotation marks omitted) (applying McDonnell Douglas burden-shifting framework to claim under the Age Discrimination in Employment Act).

Plaintiff argues that there is direct evidence that his disability likely motivated Mr. Sakagawa's decision.  This Court disagrees.  As discussed, supra, Mr. Sakagawa denied basing his decision to remove Plaintiff on his poor attendance.  Further, even if Mr. Sakagawa's decision was motivated at least in part by Plaintiff's poor attendance, there is no evidence that his consideration of Plaintiff's poor attendance amounted to a consideration of Plaintiff's disability.  Plaintiff does not point to any other evidence in the record regarding pretext, nor has this Court found any.  The Ninth Circuit has stated that "courts only require that an employer honestly believed its reasons for its actions, even if its reason is foolish or trivial

55

or even baseless." <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281
F.3d 1054, 1063 (9th Cir. 2002) (citation and quotation marks
omitted).  This Court finds that Mr. Sakagawa honestly believed
that Plaintiff's unauthorized movement of the security cameras
was a serious offense which warranted removal.

Thus, assuming, *arguendo*, that Plaintiff can establish
a prima facie case of disparate treatment disability
discrimination, this Court FINDS that Plaintiff has not raised a
triable issue of fact as to pretext.  This Court therefore
CONCLUDES that Defendants are entitled to summary judgment as to
Plaintiff's claim for disparate treatment disability
discrimination under the Rehabilitation Act.

**B.**   **<u>Rehabilitation Act - Hostile Work Environment Claim</u>**

Plaintiff also alleges a hostile work environment claim
under the Rehabilitation Act.  [Complaint at ¶ 33.]  In the
Motion, Defendants argue that Plaintiff cannot establish his
prima facie case because Plaintiff was removed for misconduct and
there is no evidence that his removal was motivated by
Plaintiff's disability.  Plaintiff did not address his hostile
work environment claim in his memorandum in opposition to the
Motion.  In their reply, Defendants argue that Plaintiff's
failure to do so precludes him from presenting any evidence on
the hostile work environment claim.  This Court agrees and FINDS
that Plaintiff has abandoned his hostile work environment claim.

See, e.g., Ramirez v. City of Buena Park, 560 F.3d 1012, 1026
(9th Cir. 2009) (noting that the appellant abandoned his state
law claims by failing to address them in either his motion for
partial summary judgment or his opposition to the defendants'
motion for summary judgment).  Even assuming, *arguendo*, that
Plaintiff has not abandoned this claim, this Court FINDS that
Plaintiff cannot establish a prima facie case because the
Agency's employment actions were based on Plaintiff's
unauthorized movement of the security cameras, no on Plaintiff's
disability.  This Court therefore CONCLUDES that Defendants are
entitled to summary judgment as to Plaintiff's hostile work
environment claim under the Rehabilitation Act.

## C. Title VII - Hostile Work Environment Claim

Count One of the Complaint alleges a hostile work
environment claim under Title VII.  Count One is based on the
same conduct as Plaintiff's claims challenging the MSPB's
decision and his Rehabilitation Act claims.  [Complaint at ¶ 32.]
Under Title VII, it is unlawful for an employer to "discharge any
individual . . . because of such individual's race, color,
religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).

In the instant Motion, Defendants raised essentially
the same arguments as to both Plaintiff's Title VII hostile work
environment claim and his Rehabilitation Act hostile work
environment claim.  Plaintiff did not address his Title VII

hostile work environment claim in his memorandum in opposition to the Motion and therefore also abandoned this claim.  <u>See</u> <u>Ramirez</u>, 560 F.3d at 1026.  Moreover, this Court notes that, to the extent that Count One alleges a hostile work environment based on disability discrimination, Defendants are entitled to summary judgment because "Title VII does not encompass discrimination on the basis of disability."  <u>See</u> <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1093 n.8 (9th Cir. 2008).  To the extent that Count One alleges a hostile work environment based on discrimination because of Plaintiff's race, color, religion, sex, or national origin, there is no evidence in the record to support such a claim.  This Court therefore CONCLUDES that Defendants are entitled to summary judgment as to Plaintiff's Title VII hostile work environment claim.

<u>**CONCLUSION**</u>

On the basis of the foregoing, the decision of the Merit Systems Protection Board, dated August 30, 2005, is HEREBY AFFIRMED, and Defendants' Motion to Dismiss, and/or for Summary Judgment, filed September 8, 2008, is HEREBY GRANTED.  The Court DIRECTS the Clerk of the Court to enter judgment in favor of Defendants on all of Plaintiff's claims.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, July 10, 2009.



/S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge

**RUSSELL D. HENION V. UNITED STATES POSTAL SERVICE, ET AL; CIVIL NO. 06-00298 LEK; ORDER AFFIRMING MERIT SYSTEMS PROTECTION BOARD'S DECISION AND GRANTING DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**